This is the first day of our new term, so I welcome everyone, masks and all. Can you all understand me? Judge Newman is with us remotely. Can you see us, Judge Newman? Yes, fine. That's great. So, let me call the first case on our calendar, Day Kimball Healthcare v. Allied World and others. Thank you. Thank you. Good morning, Your Honor. My name is Michael McCormick. I am counsel for the public's Day Kimball Healthcare, Inc. and Dr. Erica Hesselman in this appeal. With the court's permission, I would like to reserve two minutes of rebuttal time at the end of my argument. Yes. Thank you. We are here today because the United States District Court of the District of Connecticut committed a legal error in two respects with respect to two different umbrella access liability insurance policies that Day Kimball had purchased that provided coverage for a medical negligence claim that was asserted against Day Kimball and Dr. Erica Hesselman. The first error that the district court committed was that it ruled that the insuring agreement C of the Allied World umbrella liability policy, which provides excess telephone liability for claims covered by scheduled underlying insurance, only applies to provide excess coverage for claims involving employee benefits, administration liability, and not all claims covered by the underlying insurance. So by your reading, counsel, both A and C would have covered a medical malpractice? That's correct, Your Honor. And why would anyone write a policy like that? Well, that, I think, would be subject to discovery. But you look at the terms of the policy under insuring agreement A, you understand the structure of the Allied policy. It provided two forms of excess coverage. It provided umbrella liability coverage. That's what? In terms of insuring agreement A and B. Yes. Which provided umbrella liability coverage specific to certain types of claims that are identified in the schedule of underlying insurance. Medical negligence is identified as item one, and general liability is identified as item number two. The insuring agreement C is not an umbrella liability insuring agreement. It's an excess-followed-form liability agreement. An excess-followed-form policy provides coverage consistent with the coverage available under the underlying insurance. And there are a number of provisions that the district court disregarded or ignored in its narrow interpretation of insuring agreement C. The first is the definition of underlying insurance. That term was used no less than four times in insuring agreement C by Allied World. And that term is specifically defined in the Allied World policy as... But I'm looking at the chart that was an appendix, part of the appendix, and it says that three is employee benefits liability. That, you're looking at the column that says type of coverage. Yes, exactly. If you look at the definition of underlying insurance, the term means the insurance policy identified in the schedule of insurance. And in this case, the underlying insurance identified in items three and four of the schedule of underlying insurance are the two primary policies that Dave Kimball purchased to which the insuring agreement C follows form and provides excess liability coverage. The district court improperly looked at the column related to coverage and disregarded... Can you explain to me the difference between insurance and coverage, which is what I think you're getting at? There is a distinction between insurance and coverage, Your Honor. Insurance... As relevant to this case. It's relevant because insurance refers to the entire policy. Coverage refers to a subset of the policy. And the district court... The district court thought the words were interchangeable, and I... The district court did say that, but we submit that that was error, and it's inconsistent with Connecticut law. Because when... Under Connecticut law, when an insurance company uses two different terms, the court must assume that those two terms have different meanings. And it's consistent with the term underlying insurance in this Allied Worlds policy because, again, it refers to the insurance policies identified in the schedule of underlying insurance. And that's the Buxington policy, which is at issue here, and the Zurich policy, which is not at issue. In addition, Allied Worlds specifically wrote in its excess policy... So when it says insurance identified in items three and four, why would it refer to items three and four? Because that refers to the two insurance policies, the four policies, to which it provides excess probable warrant. And it follows the terms and conditions of both of those policies. Again, the key here is you have to look at the defined term underlying insurance in the Allied Policy, and specifically refers to insurance policies not covered. Additionally, Allied World policy contemplates that more than one insurance agreement can apply to a medical visit, and that's in section four of the conditions. Specifically said that multiple insurance... Well, with respect to Allied World, it seems to me that you're out of time. In other words, that the claim was not timely filed. That's true under insurance agreement A, Your Honor. Those terms and conditions are not included within insurance agreement C. C specifically provides excess liability probable warrant if the claim is covered by the underlying insurance. That's the grant in the insurance agreement. And here, the claim is covered by the Lexington insurance policy. Lexington is defending Dave Simple and Dr. Kesselman. Is that under both the Allied World and steadfast policies? It's what... Okay. Counsel, from the appendix, I'm reading a definition of the employee benefits coverage, and it says... This is JA 187. The underlying policies employee benefits coverage provides coverage for alleged wrongful acts committed while acting solely within the administration of your employee benefits program. How does that not be just about the employee benefits? Because when you interpret it that way, Your Honor, you are not following a provision in insurance agreement C that says... Insurance agreement C follows the terms and conditions of the underlying scheduled insurance, the Lexington policy. And when the court narrowly interpreted it to only apply to employee benefits coverage, the Lexington policy has two cover sections. Section A provides medical liability coverage for medical liability claims. And the second coverage section provides general liability for occurrence-based claims. And then by endorsement, the Lexington policy, endorsement number four, provides employee benefit liability claims. But by endorsement, it puts that employee benefit liability coverage into coverage section two of the Lexington policy. So when you interpret insurance agreement C to only apply to employee benefits coverage, you are ignoring coverage section one of the Lexington policy, and the other part of coverage section two, which under the insurance agreement C, says it incorporates all of the terms. Counsel, continuing where I read before, it talks about employee benefit programs, and then it says such programs include group life insurance, group accident or health insurance, profit sharing plans, pension plans, employee stock subscription plans, workers' compensation, unemployment insurance, Social Security benefits, disability benefits. That's what's included in employee benefits litigation. That's for purposes of coverage. But again, when you accept that interpretation, you are not applying the rule that an excess file form incorporates all of the terms of the underlying insurance. So you're only looking at specific provision, and you're narrowly defining coverage versus insurance agreement C, which applies for scheduled underlying insurance. Counsel, did you have any cases that you presented to the district court that adopted your interpretation of what employee benefits programs are? Nothing specific, Your Honor, as it applies to this policy. It's Connecticut law that it must incorporate all provisions of the insurance policy and give effect to every provision in order to interpret it. You can't disregard one provision to the exclusion of others. Judge Newman? Counsel, this is Judge Newman asking you a question. If we were to disagree with your point that there is a distinction between insurance and coverage, as the district court thought for purposes of this policy, have you any other basis to obtain reversal? Under the maintenance provision of the steadfast policy, Your Honor, under that provision, if the maintenance provision provides that the steadfast policy still applies to provide excess liability coverage above the Lexington policy or the Allied Board policy, if there's a failure to comply with it. Where is the failure to comply? In other words, I think when you were given an opportunity before Judge Julie to make this argument, you didn't make quite this argument. Is that correct? The failure to comply argument. We did, Your Honor, because the initial motions to dismiss to which we were responding were based solely upon lack of coverage under insurance agreement A for failure to comply with the notice provisions that are relevant only to insurance agreement A. And so, therefore, in responding to steadfast motion to dismiss on other cases, we argue that that does not excuse Allied and steadfast from providing coverage under insurance agreement C of the Allied Board. And even if it does not cover under insurance agreement C, the maintenance provision provides that steadfast still provides the same amount of coverage as if the underlying policy under insurance agreement A were available to comply with. So in this case, it simply means that if the court were to disagree with our interpretation, there's not $10 million in excess liability available under the Allied Board policy, but if there's a settlement or judgment against Dave Kimball of $11 million, steadfastness still provides. Did you make this argument with respect to agreement A? We did. Where? Because we were addressing the motion to dismiss was only based on insurance agreement A. And so we were pointing out that coverage still exists under insurance agreement C as well as under A as considered as possible. You're going to have to show me exactly where you did that. And you've got some time for rebuttal, I know. Thank you, Counsel. Your time has expired. Were you from Appellee? Good morning. Richard Simpson on behalf of Allied World. Starting from what I think here is it's important to look at the big picture and not just the specific provisions that counsel referred to. There's been a number of questions about the charge of insurance, which is in the appendix and in both the briefs. That really laid it out. The key thing is that if you accept the argument that Dave Kimball has made here, which is that insurance agreement C applies to all types of claims covered under the Lexington policy, then you've effectively written insurance agreement A and insurance agreement B out of the policy, not just the insurance agreements, but all terms and conditions relating to A and relating to B. Because under that reading, the insurance agreement C would pick up everything, every type of claim under the Lexington policy. If you look at the structure of the insurance program as set out in this chart, it makes perfect sense and it's perfectly clear. The only reason that this kind of argument can be made is that it happens that the same underlying policy provides different types of coverage. Sometimes insurers buy different policies from different companies for different types of coverage. Sometimes it's a single policy that provides multiple types of coverage. Let me ask you a question. Why wouldn't a healthcare facility that's got a number of medical doctors and medical professionals designed it? Can you hear me? Let me ask you a question. Why wouldn't a medical facility, a healthcare facility that employs a number of medical professionals not want excess coverage with at least across the board with respect to professional liability? I think they would and they haven't. This insurance agreement A applies over a very broad medical malpractice coverage provided by the Lexington policy. And so if you look at the Lexington policy, it provides the full pamphlet of the usual medical malpractice type coverage. But isn't that precisely also where a healthcare facility would want excess coverage? Yes, they would. They would want it and they purchased it. And if they had given notice as required during the policy period, they would have it. The reason that we have this argument trying to put a square peg into a round hole is because notice was not given under this claim to make and report coverage for medical malpractice. If, as the brief indicates, for whatever reason, Dave Kimball, the day after this child was born with the issues of their tribe, Dave Kimball the next day gave notice to Lexington. And as a result, Lexington is providing coverage for the medical malpractice type. If they had given notice to Allied Rural at the same time or any time before the policy expired, they would have triggered coverage under the medical malpractice excess coverage of the Allied Rural policy. They didn't do that. In fact, they didn't give notice for, I think it was close to three years. It may have been long after the end of the policy period. And as a result, their medical malpractice coverage is inapplicable. They conceded that and medical law is clear on that. And as a result, as I said, they're trying to put the square peg into the round hole on this employee liability coverage. And the question, as your question indicated, the structure here is clear. And the distinction that they attempt to make between the word coverage and the word insurance simply doesn't work. As the district court pointed out, those terms are essentially synonymous. So why were there two separate or different terms used? Is that a mistake? And if it's a mistake, how are we to determine that based on the face of the agreements? I think there's nothing in the record, and I don't know why the different word was used. But under the principles of interpretation that the district court pointed out that apply in Connecticut, you have to attempt to give a reasonable reading to them. And you can't torture the words in such a way as to result in an illogical result. It's an example I would give. If the policy in one place said the policy period is one year, in another place it said it's 12 months, it would be the same thing. The critical thing, and this is the distinction that goes to the article being marked on the other side, is it uses just the word insurance. It's not bolded. It's not defined. And it's definitely not the defined term underlying insurance. And so it's not referring to that defined term that includes the entire policy or the underlying policy. It's simply referring to insurance as a generic. And so if you look at the chart again, and the other thing that illustrates this is that insurance under C relates to both item 3 and item 4 of the declaration. So it also applies to automobile liability coverage. Now, if it happens a different cost company, Zerg, wrote that coverage. If Zerg had been employed with benefits coverage, then this argument wouldn't be possible. But the bottom line, Your Honor, is that the fundamental principle of insurance contract interpretation is to give a reasonable meaning to all of the terms. May I ask you a question, Mr. Simpson? So in insuring agreement C, it contains additional language, obviously, that doesn't appear, separate and apart from the difference between insurance and coverage, that doesn't appear in insuring agreements A and B. And that is the notwithstanding anything to the contrary contained above, if the scheduled underlying insurance does not provide coverage for reasons other than exhaustion of the limit, then this insuring agreement C similarly will not provide coverage. That's not in A and B. What are we to make of that? Because there is an argument under insurance agreement, insuring agreement A. Insuring agreement A on the medical malpractice of professional liability, if you look at the analog of world policy, it has detailed terms and conditions. It set out its own provisions where insuring agreement C relies much more heavily on incorporating the underlying, I see my time is up. Thank you, counsel. Thank you. We're going to hear from Steadfast. Oh, I didn't see you there. I thought you were remote. I'm here. Good morning, Your Honors. My name is Michael Duffy on behalf of Steadfast Insurance Company. Your Honors, the decision of the district court in this case is correct, and it should be deferred. With respect to coverage C, we relied on our brief and on the arguments of allies. Of course, your liability flows from allies. If they're not liable, you're not liable, correct? Correct. This is a follow-form policy with follow-form coverage. And it follows from allied. I'm sorry? The form you're following is allied, right? Correct. So if they're not liable, you're not liable. Correct. And if they win on their proposed interpretation of C, are you liable then as well? No, we're not. Tell me why. Well, when we say they, we mean what we think. Yeah, our position on the scope of our liability in coverage C is the same as allied rules. So we rise or fall as allied rule does under coverage C. So what if we believe their argument that it does cover professional liability under C? Would Steadfast also be liable? If allied rule is liable, then so is Steadfast. Okay, that's all I wanted to understand. Yes. All right, you may continue. So I'm going to focus on coverage A. The coverage A is professional liability coverage, which is what this case is. The coverage A provides only claims made publish. Only if a claim is made during the policy period. And the claim here was first made in the early period of 2015, which is more than two years after the end of the policy period. There is a relation back provision in section 4F of the allied rule policy. But that only applies if a notice of circumstances is given during the policy period, which never happened. And so it's undisputed that number one, the claim was not made during the policy period. And number two, there is no relation back under section 4F of the allied rule policy. Now, the language of your policy, Steadfast, with respect to timely notices as soon as practical, is that correct? I have to talk about notice of circumstances? Yes. Yes. Right. But here we're talking about what relation back means. And we follow the form of the allied rule policy. And if notice is given during the policy period, it relates back. If it's not given during the policy period, it doesn't relate back. With respect to claims made or reported coverage issues, the law in Connecticut, as you set out in our briefing, is clear that there is no prejudice or any requirement like that with respect to claims made or reported. Here's my question. Let me go back to my question because it may betray a fundamental misunderstanding on my part. So as I understand it, Allied World has got a prompt notice requirement. That is that the plaintiffs here failed to provide prompt notice. The language that Steadfast had available to it was as soon as practicable notice must be provided. You are not relying on that language at all on appeal, nor did you rely on it. That's not the basis of our motion. Okay. Our motion is based on effect. When you say your motion, you mean your appeal or your – you said motion. You mean your – that's not the basis of your appeal, of your defense to the appeal. Yeah. Our argument will always be that the claim is not made during the policy period, either directly or by way of relation back under Section 4F. And because there is no claim made during the policy period, there's no coverage, paid coverage under either policy, Allied World or Steadfast. So that's a separate argument. Okay. Now, in the court's opinion – I'm running out of time – at footnote 3, she says it because she doesn't discuss cover J. And that – and she says it because the hospital is not pursuing cover J, and that's a position conferred to the lower argument. And she said in the oral argument on page 25 that, I think, human aid is no longer in play. And the hospital said you are correct, Your Honor. So our first position of appeal is that the hospital's appeal fails under the doctrine of induced or implied error. Because even if that's wrong, when the judge says cover J is no longer in play, you need to say something if you disagree. And they agree, Your Honor. And therefore, that's why, in the court's opinion, it says that it was conferred to the lower argument that they were no longer pursuing cover J. The correctness here on that – basically, we have here a straightforward claims-made issue. We have no claim during the policy period. What they're trying to do is to say that there was a breach of a notice provision in the Rules of Requirement of the Alleged Oral Policy. But if you look at it, showing it being at A on page 77, there are two conditions. Number one, the claim has to be made within the policy period. And number two, the claim has to be reported, pursuant to section 4D. There's nothing in the Assured Agreement that talks about the reporting of circumstances. 4D does talk about the reporting of both. But 4D says nothing about the policy period. 4D just says that claims and circumstances both have to be reported promptly. And so the entire premise of the hospital's argument is wrong. There's nothing in the Alleged Oral Policy that requires reporting of circumstances within the policy period, just as promptly. So what they're trying to do here is to convert claims-made garbage into basically occurrence-based garbage with an unlimited attainment and not to turn the whole policy upside down. That's wrong. Mr. Duffy, you mentioned a specific reference to Agreement A is not in play. Were those the words that the district court used? The exact words you described. Gwen, just point me to the page, too, if you would. It's on page 25 of the transcript. I think Agreement A is no longer in play. Is there an appendix number? I'm sorry? Is there a number of reference to the appendix on appeal? I apologize. I don't have an appendix. It's page 28 of the supplemental. I've got it. Thank you. Thank you. Mr. McCormick, you reserve two minutes for rebuttal. So, Mr. McCormick, the hospital didn't report the claim in time. Is that correct? I'm sorry. The hospital did not report the claim to Allied and, therefore, Steadfast in time during the policy period. Isn't that correct? That is correct, Your Honor. So that's where we saw it from, this giant oversight by the hospital and, of course, the doctor. That reporting issue is only relevant for purposes of Interim Agreement A, and that's the basis on which Allied and Steadfast moved to dismiss it at the district court. And, Judge Wolin, this goes to your question earlier. When that issue came up at the district court, we acknowledged that timely notice wasn't provided for purposes of complying with Interim Agreement A, and, therefore, there's no coverage under A under the Allied policy, but there's still coverage under Interim Agreement C. And then with respect to the Steadfast policy, Judge Newman? Judge Newman has disappeared from our screens. He's not on our screens anymore. Just hold your thought, counsel. And we don't know when he disappeared. Well, can you hear me, even though you can't see me? Yes, I can hear you, but I can't see you. Okay, well, since you can hear me, that's sufficient for now. Okay. There we go. Oh, there you are. You're back. All right. Continue. I'm sorry. The clock continues to run, but I believe I have a minute for questions. Yes. Well, this goes to the maintenance issue, and specifically we argue in our Memorandum of Authority, which is at the record, ECF 33, pages 9-10, and in the transcript, Appendix A-9, that even if there is not coverage under Interim Agreement C under the Allied Court policy, there's still excess liability under the Steadfast policy for failure to comply with terms under Interim Agreement A. It still stays in place. It's not dropping down. And one thing I want to point out, the reason why that is, is because the Steadfast – this goes to your question – the Steadfast policy provides excess coverage in above a certain amount of limit available under the underlying insurance. The Steadfast policy defines underlying insurance as the primary or excess policy. So Lexington or Allied World. Pardon me? Lexington or Allied World. So you mean their access to Lexington is your argument? Correct. And that's in the definition of underlying insurance in the Steadfast policy at page A-114. And I want you to note that there is a typo in our brief at page 17 where it quoted underlying insurance as the primary and excess policies contributing to the underlying limit. So it's primary or excess. And finally, I just want to return, the reason why Interim Agreement C provides coverage here is because the terms specifically say that it applies above the applicable underlying limit of the scheduled underlying insurance for which the insurer becomes legally obligated to pay as a result of a claim covered by such scheduled underlying insurance. It's undisputed that the Lexington policy meets the definition of scheduled underlying insurance in the Lexington policy. Why would an insurance company do that? Why? Because Interim Agreement C is a different type of coverage than A&E. It's an excess follow-up form. And as we cite in our brief, the excess follow-up form mirrors the underlying coverage. So it was intended to cover everything that's covered in the Lexington policy. And you made a plausible claim at the district court level, and that question would be a fair answer to the discoverer, if we were given a chance. Thank you. Thank you. Thank you all. We will reserve decision. And that concludes our argument calendar for this day. So I will ask the clerk to adjourn court. Court is adjourned. Court is adjourned. Court is adjourned.